IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 20, 2006


IN THE MATTER OF: N.T.B.


**Appeal from the Circuit Court for Johnson County**
**No. 2652/2659      Thomas J. Seeley, Jr., Judge**


**No. E2005-1246-COA-R3-JV - FILED MARCH 9, 2006**


The State of Tennessee Department of Children's Services ("the State") filed a Petition for Temporary Custody of N.T.B. ("the Child") in July of 2002, alleging, among other things, that the Child was abused and/or dependent and neglected. The Juvenile Court held that the Child was a dependent and neglected child within the meaning of the law and awarded temporary custody of the Child to the State. Reba Johnson ("Mother") and Michael Blevins ("Father") appealed the Juvenile Court order to the Circuit Court ("Trial Court"), and the case was tried. After trial, the Trial Court found and held, *inter alia*, that the Child was a dependent and neglected child within the meaning of the law and that the Child had suffered severe abuse pursuant to Tenn. Code Ann. § 37-1-102(b)(21)(A) while in the care of his parents. Mother and Father appeal. We affirm.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**


D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.


K.D. Johnson, Mountain City, Tennessee for the Appellant, Reba Johnson.

Janie Lindamood, Johnson City, Tennessee for the Appellant, Michael Blevins.

Paul G. Summers, Attorney General and Reporter and Lauren S. Lamberth, Assistant Attorney General, for the Appellee, State of Tennessee Department of Children's Services.

# OPINION

## Background

Rachel Hecht, M.D., the Child's pediatrician, became concerned during her July 1, 2002, examination of the Child about the unusually large circumference of the Child's head. Dr. Hecht ordered a CT scan of the Child's head to be done on July 9, 2002. The CT scan revealed a parietal skull fracture, and Dr. Hecht called the Abuse Hotline to report her suspicions of abuse. Further testing revealed that the Child also had suffered a right retinal hemorrhage, a fractured right rib, and an ulnar fracture. The State filed a Petition for Temporary Custody, and the Juvenile Court found the Child to be a dependent and neglected child within the meaning of the law and awarded the State temporary custody. The Child was four months old at that time.

Mother and Father appealed the Juvenile Court order to the Circuit Court and the case was tried in May of 2005. David Shepherd, a family violence investigator with the Johnson County Sheriff's Department, testified at trial regarding his investigation of the injuries to the Child. Detective Shepherd testified that he interviewed Mother and Father at the Sheriff's Department. Detective Shepherd testified that he interviewed Mother first while Father waited in the lobby. Mother was accompanied by her attorney. Detective Shepherd testified that Mother told him about an incident when Father was playing airplane with the Child:

> where the child would have been what he described as prone, you know, displayed like a prone, with the child's chest in his hand and legs in his hand playing airplane going up and down. And the child - - he said the child hit its nose on his knee. She described that situation to me and could give no further explanation for the injuries that the child had.

Detective Shepherd testified that "[Mother's] emotions did not seem appropriate to me. She was highly defensive, very emotional. It just didn't - - her emotions did not seem appropriate for the line of questioning that I had." Detective Shepherd testified that Mother told him that only she, Father, and her mother had physical contact with the Child since birth and that "she could not picture any of the other two mentioned, [Father] or her mother, injuring the child." Detective Shepherd testified that he interviewed Father who reported the 'playing airplane incident' and confirmed that only Mother, Father, and Mother's mother had contact with the Child. Detective Shepherd testified:

> I felt that [Father] had a very limited knowledge as to the facts as to how the child could have actually received the injuries, but I did feel like at the end of the interview he knew how the child received the injuries, but he somewhat seemed more - - his emotions seem somewhat more appropriate than [Mother's], but well, they seemed somewhat more appropriate. He wasn't a real huge emotional range going from crying to angry like [Mother] was.

Detective Shepherd testified that Father did seem somewhat upset.

Detective Shepherd testified that he contacted the District Attorney General after the initial interviews, and Mother and Father then were charged with aggravated child abuse or neglect. The criminal proceedings were still pending at the time of the trial in the instant case. Detective Shepherd also testified:

> While [Mother] was in the office with [her attorney], she said - - she asked me if she would be forced or if her - - if she and [Father] were married, if they would be forced to testify against each other, and [her attorney] just told - - what I would call give her the hush sign and they could talk about that later.

Dr. Hecht, the Child's pediatrician, also testified. Dr. Hecht testified that when she examined the Child on May 28, 2002, she noted that the Child had been seen in the emergency room for vomiting and had some abrasions. Dr. Hecht also noted that the Child had bruising on his forehead and left anterior shoulder. Dr. Hecht testified that she wrote in her notes at that time that she doubted abuse because she was given a decent explanation for the nose abrasion. Dr. Hecht testified that she was told:

> [Mother] picked up the baby and that the nose had gotten scraped on, I think the zipper of the jeans, which I guess at the time sounded plausible to me … although it is uncommon for infants to have bruises, things do happen and, and being a mother myself, I can remember times when my very young children had scratches and bruises that weren't abuse, so at that, that point I did not feel like this was abuse….

Dr. Hecht testified that on the Child's four month well-baby visit on July 1, 2002, the Child's large head circumference raised a red flag for her. Dr. Hecht testified that she ordered a CT scan and explained her reasons for doing so stating:

> number one was probably my concern. Number two was parental concern. Number three, probably the head circumference in relation to the baby's size, … we can't look at the growth chart and you can't just look at one part of a growth chart in isolation.…The head was out of proportion to the body and it was a relatively new phenomenon that his head had been trucking along at the fiftieth percentile and then jumped up to, it looks like at the two month visit was somewhere between the seventy-fifth and ninetieth, which isn't … an eye catching thing, but then is well into the ninetieth percentile with a weight and the length of the tenth percentile.

Dr. Hecht also noted at that time that the Child had some asymmetry to his head.

Dr. Hecht testified that she received a phone call from the radiologist, Marianne R. Neal, M.D., on the day the CT scan was performed and that she was told that the Child had a parietal skull fracture. Dr. Hecht testified that the Child had the only skull fracture in an infant four months

old or younger that she has seen while in private practice. However, Dr. Hecht testified that she did see skull fractures in infants while she was doing her residency "and they were all abuse related." Dr. Hecht testified that the Child's enlarged head circumference was associated with the skull fracture and the ensuing bleeding and stated:

> probably the reason that [the Child] wasn't symptomatic neurologically or grouchy or anything was because his bones were allowed to spread. If you or I took a knock to the head and had bleeding and swelling of our brain, we would be much more symptomatic than an infant, because, because his skull was allowed to move and there wasn't a lot of pressure on his brain.

Dr. Hecht testified that she and Dr. Neal agreed that further testing should be done including an MRI and a skeletal survey, also called a Kempi series. When asked why further testing was needed, Dr. Hecht testified:

> I've had quite a bit of experience in abuse cases and typically if we, if we suspect an abuse in a young infant or a child, a couple of things you look for. You look for other fractures, which is why we did the Kempi series and the other thing is if there's a force that's great enough to cause a fracture of the skull with bleeding in the brain that, that you worry about retinal hemorrhages. That that's not uncommon in, in infants who have sustained a trauma.

Dr. Hecht also recommended that the Child be examined by an ophthalmologist.

Dr. Hecht testified that she spoke on July 15, 2002, with Dr. Agarwai, the ophthalmologist who examined the Child, and was told the Child has a right retinal hemorrhage. Dr. Hecht testified that "typically … retinal hemorrhages are caused from taking an infant and shaking them." Dr. Hecht admitted that typically a retinal hemorrhage from child abuse occurs in both eyes, but stated that she discussed this with Dr. Agarwai "and it was felt that [the Child] had trauma to the right side and that may explain why there's one, there's only one side involved with the, as far as the eye being involved."

Dr. Hecht testified that it seemed like this case involved some type of impact and stated:

> It would take a pretty good amount of force, I would say. But I see tons and tons of babies who roll off the bed, roll off the sofa, take mild hits to the floor and don't have any bad subsequent results from it. That it's, if all it took was a little bump to cause that kind of trauma, lots of babies would have skull fractures.

Dr. Hecht testified that there is nothing that a baby of this age could do to cause this type of injury to itself. Dr. Hecht opined that the injury to the Child probably occurred "some time right before that ER visit that she had where the baby was throwing up." Dr. Hecht testified that she has never seen

in her practice a skull fracture and a retinal hemorrhage that was caused by anything other than abuse.

Dr. Hecht testified that she spoke with the Child's foster mother on July 24, 2002. The foster mother told her that the Child was being taken to another doctor to rule out osteogenesis imperfecta as the cause of the Child's injuries.

The Child was taken to Arthur Randolph Garrett, Jr., M.D. for an opinion as to whether the Child had osteogenesis imperfecta ("OI"). Dr. Garrett testified that the Child was referred to him by the State, and that he saw the Child in July of 2002. Dr. Garrett testified that he took a history, examined the Child, reviewed x-rays, and consulted with a radiologist. Dr. Garrett testified that he formed the opinion that the Child did not have OI and he "didn't think that [the Child] had increased risk of bone breakage …." Dr. Garrett testified that he would expect to see further breaks within a year if a child had OI and the child's activities were not restricted. Dr. Garrett testified that OI occurs in only approximately 1 in 15,000 or 1 in 20,000 births.

When asked how much force it would take to break a baby's arm, Dr. Garrett testified:

> A baby is pretty, you know, flexible and they don't have much leverage either, so I don't know in terms of the physical statements of the forces involved, but it's a very uncommon thing to see because their bodies aren't big enough to apply leverage to, you know, cause fractures like you and I step in a post hole. We put a lot of leverage on our ankle.…Babies have neither the size, weight, length, to put that kind of force on it, so generally just when somebody picks them up or they're caught under something, you know, like a piece of furniture falling on it.

Dr. Garrett testified that "in clinical practice you don't see many infant fractures."

Timothy William Cox, the Child's paternal grandfather, testified at trial. He and his wife, Father's mother, have had custody of the Child since the Child was seven months old. Mr. Cox testified that the Child recently turned three. Mr. Cox testified that from the time the Child began living with him and his wife, the Child has had no serious injuries and no broken bones. Mr. Cox further testified that the Child cannot see from his right eye. Mr. Cox and his wife have taken the Child to several doctors and have an appointment to take the Child to an eye specialist at Duke Medical Center.

Gary Gitschlag, M.D., an ophthalmologist who examined the Child in July of 2003, testified that his examination of the Child revealed "less than legally blind vision on that right eye.…In other words [the Child] had a scar on the retina of the right eye which would preclude good vision…." Dr. Gitschlag testified that the scarring is not correctable and explained that "the tissue [in the Child's right eye] has been disrupted and so the normal architectural (sic) doesn't exist and

we don't know how to make new retinal cells yet." Dr. Gitschlag opined that the scarring he saw could have been caused by someone shaking the Child.

Marianne R. Neal, M.D., who is board certified in diagnostic radiology and pediatric radiology, also testified. Dr. Neal testified that she reviewed the x-rays of the Child including 74 images of his head, including a three-dimensional reconstruction of the calvarium. Dr. Neal testified she:

> saw extra-axial fluid collections which are collections outside of the brain. They were larger on the right than on the left. There was some area of increased density in that right collection which raised the suspicion of hemorrhage within it. In addition, the three-dimensional reconstruction showed a linear right parietal skull fracture.

Dr. Neal testified that "hemorrhage does not occur in extra-axial fluid collections without trauma, significant trauma." Dr. Neal testified that "[a]ny type of skull fracture in a four month old infant in the absence of known trauma is … non-accidental trauma … [t]hat means that it's purposeful trauma by a perpetrator."

Dr. Neal testified that she recommended an MRI after reviewing the x-rays. The MRI was done three days later. Dr. Neal testified that an MRI, as compared to a CT, "shows better detail and it also is able to differentiate hemorrhage from normal cerebral spinal fluid that circulates around the brain." Dr. Neal testified that she reviewed 208 images on the MRI and found that "the fluid collection seen on the CT was indeed a subdural hematoma. It had two different signals within the fluid which indicates two different ages of the blood … suggests some significant shaking or shaking impact."

When Dr. Neal was asked about the degree of injury, she testified "in a worse case would be death. There can, these subdural hemorrhages can enlarge and cause pressure on the brain and even strokes." Dr. Neal testified that these injuries also could result in severe bodily injury. Dr. Neal testified that "retinal hemorrhages can occur with shaking and shaking impact which may be, result in eye damage. Again, a multitude of intracranial findings that could occur such as stroke, disability."

Dr. Neal testified that after the MRI was performed, a bone survey was done to look for fractures. Dr. Neal testified that her review of the bone survey revealed a left ulna fracture, which was aged at 7 to 10 days and a "healing right lateral 7th rib fracture … aged that at approximately 15 to 20 days." Dr. Neal testified that an arm and rib fracture "without the history of significant trauma, would be consistent with shaking or non-accidental trauma." When asked, Dr. Neal testified that the Child's injuries would be inconsistent with a fall from a changing table. She further explained that "the intracranial findings, the subdural hematoma would require significant trauma, meaning a fall from a significant height onto a very hard surface…."

Dr. Neal opined that the Child's injuries are inconsistent with the parents' explanation of the playing airplane incident. Dr. Neal also testified that further studies were done on the Child and opined that "it would be very unlikely this child had osteogenesis imperfecta."

After trial, the Trial Court entered an order on July 8, 2005, finding and holding, *inter alia*:

Accordingly, this Court finds by clear and convincing evidence, after reviewing all evidence, that [the Child] suffered significant and severe injuries which resulted in permanent damage and that all injuries identified were sustained when this child was in the custody and care of [Mother], [Father] or possibly, [Mother's] mother and that he is a dependent and neglected child within the meaning of the law and pursuant to T.C.A. §37-1-102(b)(12)(G), in that he has suffered abuse and neglect; that T.C.A. §37-1-102(b)(1) defines abuse by stating that abuse exists when a person under the age of eighteen (18) is suffering from, has sustained or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker; that he has suffered severe child abuse within the meaning of the law and pursuant to T.C.A. §37-1-102(b)(21)(A), in that his parents knowingly exposed or failed to protect this child from abuse or neglect that did cause great bodily harm; that this abuse meets the definition of "severe" because there were multiple injuries to this infant which, according to expert testimony, were caused by actions at different times; that none of the injuries fit the time line or explanation offered by his parents; that the explanation offered by [Mother and Father] is inconsistent with the injuries identified; and that the injuries sustained by this child are very suggestive of shaking or other non-accidental trauma; that the severe child abuse was known in that the injuries sustained by this child were either caused by one or both [parents] or occurred by their reckless, knowing disregard, and that in all likelihood, one parent abused the child and the other parent is protecting that parent; that this Court's finding of severe abuse is consistent with *In Re D.L.(P.)C.*, 2003 WL 22955942 (Tenn. App. Dec. 15, 2003), *no perm. app. filed*, wherein the Court of Appeals found that there was clear and convincing evidence of severe abuse against both parents upon the same type of evidence; that it is contrary to the child's welfare to remain in the care, custody, or control of his parents; and that it was reasonable and in the best interest of the child to remove the child from the home. In the best interest of [the Child], and the public, it is therefore, **ORDERED, ADJUDGED AND DECREED:**

* * *

3. That [the Child] has suffered severe abuse pursuant to T.C.A. §37-1-102(b)(21)(A), which abuse occurred while in the care of his parents.

Mother and Father appeal the finding of severe abuse pursuant to Tenn. Code Ann. § 37-1-102(b)(21)(A).

## Discussion

Although not stated exactly as such, Mother and Father each raise the issue of whether the Trial Court erred in finding severe child abuse pursuant to Tenn. Code Ann. § 37-1-102(b)(21)(A) and that this abuse occurred while the Child was in their care. Although Mother and Father have filed separate appeals, Mother has chosen to adopt by reference the issue and argument contained in Father's appellate brief pursuant to Tenn. R. App. P. 27(j).

A finding of dependency and neglect must be based upon clear and convincing evidence. Tenn. Code Ann. § 37-1-129(c) (2005). Our review, however, is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). As this Court discussed in *In re: H.A.L.*:

> Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion.

*In re: H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 Tenn. App. LEXIS 240, at*13 n.10 (Tenn. Ct. App. April 25, 2005), *no appl. perm. appeal filed*, (discussing the clear and convincing standard in a case involving a termination of parental rights). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

As pertinent to this appeal, severe child abuse is defined in Tenn. Code Ann. § 37-1-102(b)(21) as:

(21) "Severe child abuse" means:

(A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;

Tenn. Code Ann. § 37-1-102(b)(21)(A) (2005).

Mother and Father each argue that they did not abuse the Child, they have no actual knowledge of what happened to the Child, and that there were no "visible signs or specific reasons"

that would place them on notice that someone else had abused the Child, and, therefore, they did not knowingly expose the Child to abuse or fail to protect child from abuse.

This Court discussed the "knowing" requirement as contained in Tenn. Code Ann. 37-1-102(b)(21) in the case of *In re: R.C.P.* stating:

> For the purpose of determining whether a parent's conduct runs afoul of Tenn. Code Ann. § 37-1-102(b)(21), parents who are present when a child is abused but who fail to intervene to protect the child have knowingly exposed the child to or have failed to protect the child from abuse. However, the "knowing" requirement in Tenn. Code Ann. § 37-1-102(b)(21) is not limited to parents who are present when severe abuse actually occurs. A parent's failure to protect a child will also be considered "knowing" if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur. *West Va. Dep't of Health & Human Res. ex rel. Wright v. Doris S.*, 475 S.E.2d at 878-879.

*In re: R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 Tenn. App. LEXIS 449, at *25-26 (Tenn. Ct. App. July 13, 2004), *no appl. perm. appeal filed.*

Mother and Father both stick to their story that the Child must have received the injuries while playing airplane with Father. However, the expert medical testimony was not just clear but instead was overwhelming that the injuries to the Child could not have occurred in this manner. Dr. Neal testified that "[a]ny type of skull fracture in a four month old infant in the absence of known trauma is … non-accidental trauma … [t]hat means that it's purposeful trauma by a perpetrator." Dr. Neal further testified that an arm and rib fracture "without the history of significant trauma, would be consistent with shaking or non-accidental trauma," and would be inconsistent with a fall from a changing table, or the parents' explanation of the playing airplane incident. Dr. Hecht, the Child's pediatrician, testified that the Child had the only skull fracture in an infant four months old or younger that she has seen while in private practice. Dr. Hecht further testified that she did see skull fractures in infants while she was doing her residency "and they were all abuse related." Further, Dr. Hecht testified that there is nothing that a baby of this age could do to cause this type of injury to itself. Dr. Gitschlag opined that the scarring he saw when he examined the Child's eye could have been caused by someone shaking the Child.

Dr. Hecht testified that it seemed like this case involved some type of impact and stated:

> It would take a pretty good amount of force, I would say. But I see tons and tons of babies who roll off the bed, roll off the sofa, take mild hits to the floor and don't have any bad subsequent results from it. That it's, if all it took was a little bump to cause that kind of trauma, lots of babies would have skull fractures.

Along the same vein, Dr. Garrett testified:

> A baby is pretty, you know, flexible and they don't have much leverage either, so I don't know in terms of the physical statements of the forces involved, but it's a very uncommon thing to see because their bodies aren't big enough to apply leverage to, you know, cause fractures like you and I step in a post hole. We put a lot of leverage on our ankle.…Babies have neither the size, weight, length, to put that kind of force on it, so generally just when somebody picks them up or they're caught under something, you know, like a piece of furniture falling on it.

The evidence clearly shows that the Child's injuries were very serious. Dr. Neal testified that these injuries could result in severe bodily injury or death. She stated: "these subdural hemorrhages can enlarge and cause pressure on the brain and even strokes." Both Dr. Neal and Dr. Garrett agreed that OI could be ruled out as a cause of the injuries received by the Child, a conclusion supported by the fact that once he was removed from his parents' custody over two years ago, the Child has suffered no serious injuries or broken bones.

The evidence also clearly shows that the injuries suffered by the Child occurred at different times. Dr. Neal testified that "the fluid collection seen on the CT was indeed a subdural hematoma. It had two different signals within the fluid which indicates two different ages of the blood.…" Dr. Neal testified that the left ulna fracture was aged at 7 to 10 days and the "healing right lateral 7th rib fracture … aged that at approximately 15 to 20 days."

The evidence clearly shows that there were sufficient facts presented to these parents from which, at a minimum, each could have, and should have, recognized that severe child abuse had occurred or that it was highly probable that it would occur. The Child's injuries, which occurred while the Child was very young, were multiple, very serious, inflicted on separate occasions with great force, and not self-inflicted or accidentally inflicted. In addition, Detective Shepherd testified that Mother's reactions to his questions seemed inappropriate and he felt that:

> [Father] had a very limited knowledge as to the facts as to how the child could have actually received the injuries, but I did feel like at the end of the interview he knew how the child received the injuries, but he somewhat seemed more - - his emotions seem somewhat more appropriate than [Mother's], but well, they seemed somewhat more appropriate. He wasn't a real huge emotional range going from crying to angry like [Mother] was.

Detective Shepherd also testified:

> While [Mother] was in the office with [her attorney], she said - - she asked me if she would be forced or if her - - if she and [Father] were married, if they would be forced to testify against each other, and [her attorney] just told - - what I would call give her the hush sign and they could talk about that later.

Clearly, Mother was concerned about she or Father being forced to testify against the other in the criminal proceedings.

The Trial Court specifically found and held:

that [the abuse of the Child] meets the definition of "severe" because there were multiple injuries to this infant which, according to expert testimony, were caused by actions at different times; that none of the injuries fit the time line or explanation offered by his parents; that the explanation offered by [Mother and Father] is inconsistent with the injuries identified; and that the injuries sustained by this child are very suggestive of shaking or other non-accidental trauma; that the severe child abuse was known in that the injuries sustained by this child were either caused by one or both [parents] or occurred by their reckless, knowing disregard, and that in all likelihood, one parent abused the child and the other parent is protecting that parent; …

The evidence does not preponderate against the Trial Court's findings. We hold there is clear and convincing evidence to support the Trial Court's ultimate conclusion that "[the Child] has suffered severe abuse pursuant to T.C.A. §37-1-102(b)(21)(A), which abuse occurred while in the care of his parents." We, therefore, affirm the Trial Court's July 8, 2005 order.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed equally against the Appellants, Reba Johnson and Michael Blevins, and their sureties.

_____
D. MICHAEL SWINEY, JUDGE