# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs August 1, 2022

## IN RE AUBREE D.

### Appeal from the Circuit Court for Overton County
No. 20-CV-10  Amy V. Hollars, Judge

_____

### No. M2021-01229-COA-R3-JV

_____

This is a dependency and neglect case. The child was taken into protective custody by Appellee Tennessee Department of Children's Services ("DCS") after an investigation revealed that the then ten-week-old child suffered approximately 15 bone breaks. The Juvenile Court for Davidson County conducted a hearing and adjudicated the child dependent and neglected on its finding that Appellant, the child's mother, had committed severe child abuse. Mother appealed to the Circuit Court for Overton County ("trial court"). Following a de novo trial, the trial court held that mother perpetrated severe child abuse on the child. Consequently, the trial court adjudicated the child dependent and neglected, and found that it was in the child's best interest to remain in the custody of Appellee Tennessee Department of Children's Services ("DCS"). Mother appeals. Discerning no error, we affirm.

### Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. McCLARTY, J., joined.

Kelly R. Williams,[1] Livingston, Tennessee, for the appellant, Taylor R.[2]

Herbert H. Slattery, III, Attorney General and Reporter, and Erica M. Haber, Assistant Attorney General, for the appellees, Tennessee Department of Children's Services, and Austin D.

_____

[1] Kelly R. Williams did not represent Appellant at the trial level.

[2] In cases involving minor children, it is the policy of this Court to redact the parties' and children's names to protect their identities.

# OPINION

## I. Background

Aubree D. (the "Child") was born in March 2019. Appellant Taylor R. ("Mother") and Austin D. ("Father") were never married,[3] but they were living together when the Child was born. At the time of the Child's birth, Mother worked as a certified nursing assistant; by the time of trial, she was a full-time college student, studying to be a medical assistant. Mother took four weeks of maternity leave immediately after the Child was born. During the first weeks of the Child's life, Father worked sixteen-hour, overnight shifts at his road construction job. Because Father worked nights, Mother handled most of the day-to-day parenting responsibilities. When Mother returned to work after her maternity leave, she worked a full-time schedule with twelve-hour shifts from 6:00 a.m. to 6:00 p.m. While Mother worked, Father watched the Child during the day. On weekends, the Child stayed with her maternal grandmother, Melinda R. ("Grandmother"), or a sitter. Melinda R. testified that the Child "cried a lot . . . like somebody with colic."

On March 22, 2019, the Child was seen at the Overton County Health Department ("Health Department") for a two-week checkup. At that time, Mother reported that the Child was having abdominal pain and was spitting up quite a bit; the Child's formula was changed, and Mother stated that this helped her symptoms. At the March 22, 2019 checkup, no abnormalities were noted.

On March 25, 2019, Mother brought Aubree to her pediatrician, Dr. James Nelson, for vomiting and diarrhea.[4] Dr. Nelson surmised the Child's "gassiness," vomiting, diarrhea, and fussiness were the result of "heartburn" or "reflux," and he prescribed over-the-counter gas drops. On April 4, 2019, when Aubree was 27-days old, Mother brought her to Dr. Nelson's office "to look at [her] mouth and leg." On examination, Aubree's pulse was 180, which was "higher than it should have been," and could indicate pain in an infant. Mother was concerned about Aubree's leg "bowing," but examination revealed normal position and movement.

Mother brought Aubree back to Dr. Nelson on April 23, 2019, and reported that the Child's left eye was very crusty, and she was screaming at night. During her testimony, Mother admitted that, before the April 23, 2019 doctor's visit, she had seen bruising on Aubree, but she did not tell Dr. Nelson about it. Mother explained that "bruises go away, they might not have been visible at the time," and that she "might of [sic] overlooked it" because she "was a new mother" at the time and "didn't know what to look for and what to do." At her April 23rd doctor's visit, Aubree's pulse was 196—a measurement of 160 is indicative of pain in an infant. Following his examination, Dr. Nelson prescribed Zantac

---

[3] Father did not appeal the trial court's order, and he is not a party to this appeal.
[4] The Child's Grandmother was employed by Dr. Nelson office as a receptionist.

to treat the Child's acid reflux because "it was obviously getting worse."

On May 8, 2019, Mother and Father took the Child to the Health Department for a "wellness checkup." The treating nurse, Megan Reeder, RN, noted a dime-sized bruise on Aubree's left cheek, and a bruise on the right side of the Child's abdomen. Nurse Reeder testified that this was an abnormal finding, and she was "very concerned." Mother allegedly told Nurse Reeder that the bruises "pop up for no apparent reason."[5] Both Mother and Father expressed concern about the bruising, and Mother informed Nurse Reeder that Grandmother had also seen "a couple" of bruises the size of "fingerprints" around the Child's ribcage. Mother stated that the bruising had been present for approximately two days prior to the Health Department visit. Based on Mother's statement that the bruises would "pop up," and based on Father's occupation in road construction (which has a high risk for lead toxicity), Nurse Reeder was concerned that Aubree had lead poisoning and recommended that the parents immediately take the Child to her pediatrician for lead testing. Although Nurse Reeder testified that she had never before seen bruising on a two-month old, she explained that in view of the parents' concern, she did not immediately suspect abuse.

Although Dr. Nelson last saw Aubree on May 16, 2019, more than a week after the Child was seen by Nurse Reeder, there is no indication in Dr. Nelson's records that the parents requested or discussed lead testing as Nurse Reeder had recommended. Rather, the purpose of Aubree's May 16th visit was for Dr. Nelson to follow up on her gastrointestinal issues, which he testified were improved with medication. There is a notation in Aubree's medical records from the May 16, 2019 visit that indicates "bruising" in the "other concerns I would like to discuss" section of Dr. Nelson's notes, but Dr. Nelson testified that he did not see that notation in the record, and he did not recall the parents or Grandmother telling him that bruising was a concern. Mother claims she discussed the bruising with Dr. Nelson during this visit, and he was not concerned and told her Aubree was "fine," so she trusted his opinion as Aubree's primary physician. Mother further testified that, during the May 16, 2019 visit, she and Dr. Nelson discussed Nurse Reeder's concerns about possible lead poisoning; however, there is no indication in Dr. Nelson's records that Mother, Father, or Grandmother spoke to him about lead poisoning or bruising issues. In his testimony, Dr. Nelson was adamant that neither parent mentioned any concern about bruising. Dr. Nelson stated that, if he had observed or been told of bruising, he would have requested an explanation from the parents. If they could not explain the bruising, then Dr. Nelson would have ordered an x-ray. Dr. Nelson acknowledged that unexplained bruising on a child could be indicative of neglect and abuse, and he further stated that he had personally encountered this during his residency. If he had been made aware of bruising on a two-month-old child,

---

[5] At trial, Mother first testified that she had not seen bruising on the Child prior to the two days before her May 8, 2019 visit to the Health Department. However, after being impeached with her testimony from just a week prior, Mother admitted that she had seen "pea-sized" bruising on the Child when she was about a month old.

who cannot crawl or move about on her own, this would have caused him to do a much more thorough, head-to-toe examination.

On May 18, 2019, when Aubree was 10-weeks old, Mother was at work when she received a call from Father. Mother explained that Father was crying and upset, and he told her that something was wrong with Aubree. Mother testified that she was "terrified" because she did not know what was wrong with the Child. Mother left work immediately and called Grandmother in route. Mother arrived home to find Father "screaming, crying and just not normal," "standing over" Grandmother, who was holding Aubree and trying to calm her. Father explained that Aubree's arm "popped" when he was taking her out of the bassinet, that it "got caught," and he thought it was broken. Mother and Father took Aubree to the Livingston Hospital Emergency Room, where Aubree's arm was x-rayed and found to be broken. DCS was contacted.

Child Protective Service Investigator Harli Langford, who specializes in severe abuse cases, was assigned to the case. CPSI Langford went to Livingston Hospital where she interviewed the parents separately.[6] Both parents denied knowing how Aubree sustained a broken arm. Neither parent reported any concerns about Aubree or gave any information to CPSI Langford about Aubree's relevant medical history, including the fact that Aubree had been seen by Dr. Nelson and Nurse Reeder. Neither parent mentioned Nurse Reeder's concern over bruising and possible lead poisoning. CPSI Langford testified that the parents' failure to disclose this information was a "a red flag." CPSI Langford also testified that Mother denied having any concerns about her relationship with Father, his care of Aubree, or his parenting style.

Because it is very uncommon for an infant Aubree's age, who is immobile, to sustain a broken bone and because Livingston Hospital personnel could not determine the cause of Aubree's broken arm, the team at Livingston Hospital recommended that Aubree undergo a full medical evaluation by Vanderbilt Hospital's CARE Team.[7] CPSI Langford asked Mother and Father to take Aubree to Vanderbilt for the CARE Team evaluation on May 20, 2019, but they failed to show up for the appointment because Mother was not feeling well and Father had worked late and was too tired to drive to Nashville. Mother and Father eventually took Aubree to Vanderbilt on May 22, 2019. The record indicates that Father was not alone with Aubree between May 18, 2019 (when she was seen at Livingston

---

[6] CPSI Langford also worked with Overton County Sheriff Department Detective Ralph Mayercik during her investigation. It is customary for CPSI Langford to work side-by-side with law enforcement in alleged severe abuse cases to perform the investigation and share information. Detective Mayercik interviewed Aubree's babysitter and Grandmother, and neither provided information as to how Aubree sustained a fractured arm.

[7] The CARE Team is a group of doctors and social workers who evaluate complex cases. When the Team does a consult on a child, they perform a full skeletal scan, complete blood work, meet with the parents and gather detailed historical information about the events leading up to the injury, review and discuss findings, and make recommendations as to how they think the injury occurred.

Hospital) and May 22, 2019 (when she was seen at Vanderbilt); however, Mother and Grandmother were alone with Aubree during this time period.

At Vanderbilt, Aubree underwent a full medical evaluation. A skeletal survey showed multiple fractures in different stages of healing. There were fractures of the ribcage on the anterior left third, fifth, sixth, and seventh ribs. Possible fractures of the ribcage were also noted at the anterior left fourth and ninth levels. On the posterior, left side of the ribcage, fractures were identified at the third, tenth, and eleventh ribs, and possibly the fourth, fifth, seventh, and eighth. On the anterior, right-side fractures of the third, fifth, and sixth ribs were observed, with possible fractures of the eighth and ninth ribs. On the posterior, right-side, acute or "new" fractures of the third, fourth, fifth, sixth, and seventh ribs were identified. Doctors also found an irregularity of the left distal femur, which strongly suggested an evolving fracture. Aubree's distal right tibia had a "bucket handle fracture" near the ankle. Imaging studies revealed a probable fracture of the left proximal tibia near the knee. Aubree's forearm had been placed in a cast by the Livingston Hospital doctors, and the cast was still present when she was seen at Vanderbilt's emergency room. The skeletal scan taken at Vanderbilt showed lineal fractures in the two bones of her forearm near the elbow. In addition to these fractures, Aubree had some distention of the abdomen with fluid and gas. In sum, the Vanderbilt examination showed "[m]ultiple rib fractures in various stages of healing, as well as bucket-handle fractures metaphyseal fracture of the left proximal tibia and possibly the left distal femur." The doctor noted that "these fractures in a 10-week-old are highly consistent with non-accidental injury." In addition to the x-rays and skeletal scans, Vanderbilt resident physician, Dr. Christopher Daly, performed a physical examination of the Child. Dr. Daly noted that the Child was "well-appearing," with her left arm wrapped in soft gauze, and with no other injury or bruising, but she was positive for joint swelling. Dr. Daly noted that the skeletal scan showed multiple fractures that were consistent with non-accidental trauma. The CARE Team also obtained various types of labs, bone tests, and a head CT scan, which were all normal. They also consulted with DCS. While Aubree had no acute surgical need, she required further workup and CARE Team evaluation. Due to safety concerns, the Child was admitted to the hospital. The final admitting diagnosis was "non-accidental trauma injury."

In addition to examining and treating the Child, due to the suspected abuse/neglect, the police were contacted, and a Vanderbilt social worker conducted a psychosocial assessment. Mother, Father, and Grandmother participated in the assessment. According to Vanderbilt's records, both parents reported that Mother was at work and Father was at home when the injury to Aubree's arm occurred. Mother reported that when she got home, "she knew something was wrong," that Father "told me what he had done," and that they sought medical care immediately. Father told the social worker that Aubree's left arm fracture was "a freak accident." He stated that "it just happened," and that he heard a "pop" when he took Aubree from her bassinet. Father went on to explain that, when he placed Aubree on the bed, he noted that she was not moving her left arm; Father then tried to

manipulate her arm and felt it "snapping like a piece of chalk."

Mother also told the social worker that Aubree "cried and cried" for the first month of her life, that it was "constant," and that she was "fussy all the time." Mother explained that she thought "something is wrong with my baby," and reported that she discussed these concerns with Aubree's pediatrician. Father also reported that Aubree was "real fussy," "did not like being held," and was often placed in a swing. He further reported that Aubree often appeared to "breathe hard" and would "jerk," which would "start her crying."

Both parents denied any known mechanism for Aubree's additional injuries. When asked about Aubree's medical history, the only medical problem that Mother and Father reported was acid reflux. Both parents further denied any: (1) known history of injury, trauma and/or fall; (2) safety concerns in the home; (3) history of domestic violence; (4) prior DCS involvement; (5) substance abuse; (6) history of mental illness; and (7) criminal activity. The social worker noted that, when Father was informed of Aubree's additional injuries that were discovered by the Care Team, he appeared to cry with no tears and expressed concern that he would be "blamed," "interrogated," and "called a liar." The social worker relayed the foregoing information to CPSI Langford and Detective Mayercik.

Due to concerns of abuse and neglect, Dr. Heather Williams, an Assistant Professor of Clinical Pediatrics at Monroe Carell, Jr. Children's Hospital at Vanderbilt and a board-certified physician in child-abuse pediatrics, also met with Mother and Father. Dr. Williams explained that her practice involves seeing child abuse and neglect cases and supervising nurses who handle child sexual abuse cases. Her specialty is assessing a child's injuries to determine whether they result from non-accidental trauma or accident. Dr. Williams was admitted as an expert in child abuse pediatrics without objection.

Mother and Father generally told Dr. Williams the same story concerning Aubree's broken arm. They also denied any previous bruising, and failed to mention Nurse Reeder's concerns about possible lead poisoning. However, neither parent could explain how the Child sustained approximately 15 fractures in the first two-months of her life. Based on her consultation and review of the Child's medical records, Dr. Williams opined that there was "no accidental mechanism of injury" that could explain Aubree's injuries. Dr. Williams explained that Father's statements were "inadequate to explain" the Child's injuries. She also noted that Aubree's injuries were in different stages of healing, which indicate that the Child had been injured on multiple occasions. In her deposition, which was admitted at trial, Dr. Williams testified that "rib fractures and CMLs are highly specific for abusive mechanisms of injury," and such injuries are consistent with the diagnosis of child physical abuse. Dr. Williams testified that "not all fractures are created equal," and that bucket-handle fractures are caused one of two ways: from tension strength (*i.e.*, a "forceful yanking" of an extremity "with a little bit of a twist") or "a shearing force" (*i.e.*, the "forceful flailing of the arms and legs"). Concerning the injuries to Aubree's ribs, Dr. Williams testified that rib fractures are caused either by blunt-force trauma to the chest or

from compressive forces. Because such injuries do not ordinarily occur with immobile infants, Dr. Williams explained that, when an immobile infant has multiple fractures and a caregiver does not have a plausible explanation as to how they occurred, "it is extremely concerning for non-accidental trauma." Nonetheless, Dr. Williams considered whether Aubree might suffer from any metabolic bone conditions or genetic conditions that might cause her bones to break more easily. However, no underlying bone conditions were identified that could explain Aubree's injuries as "pathologic fractures." Dr. Williams observed that the fact that Aubree sustained no fractures during the eighteen months she had been in DCS custody further validated her opinion that there were no underlying bone diseases that might cause Aubree's bones to fracture more easily than other children's. Dr. Williams testified unequivocally that Aubree would have felt pain from an un-splinted fracture, and would have been fussy and difficult to soothe, especially when the affected bone was moved or touched. Pain would likely also cause changes in the Child's feeding and sleeping habits. According to Dr. Williams, these pain reactions would have been noticeable to Aubree's caregivers. Dr. Williams recommended a follow-up skeletal survey and noted that the report to DCS alleging physical abuse was appropriate.

Vanderbilt performed a follow-up skeletal survey approximately two weeks after Aubree's initial skeletal scan. The follow-up skeletal survey confirmed multiple fractures, including some that were not evident on the initial scan. The follow-up scan also showed, in greater detail, the evolution and healing of the Child's injuries. Dr. Williams diagnosed Aubree with child physical abuse.

To treat her injuries, Aubree was seen by the orthopedic department at Vanderbilt on May 23, 2019. ACE wraps were applied to her left upper, right lower, and left lower extremities. The orthopedic surgeon did not recommend casts or splints given Aubree's age and activity level, and so the ACE wraps were applied solely for comfort. The orthopedist further noted that the family gave "vague history and inconsistent stories" and could not "give any kind of reasonable explanation as to how these injuries happened." Accordingly, he recommended a "thorough conversation with the family."

Turning to DCS's dependency and neglect investigation, CPSI Langford testified that, after Aubree was seen at Vanderbilt on May 22, 2019, Vanderbilt called CPSI Langford and told her, "This baby is broken." Based on Vanderbilt's assessment that Aubree was the victim of non-accidental trauma and the fact that some of the Child's injuries dated back to when she was only two-weeks old, DCS filed a Petition to Declare Child Dependent and Neglected and For Emergency Temporary Legal Custody. Before Aubree was released from Vanderbilt, the juvenile court entered a Protective Custody Order, and Aubree was released to DCS custody on May 23, 2019.

On May 23, 2019, DCS held a meeting with Mother, Father, and law enforcement. Randal Slayton, a criminal investigator with the District Attorney's Office for the 13th Judicial District, was asked to assist Detective Mayercik with an on-going investigation

into Aubree's injuries and conducted an interview with Father at the DCS office. Investigator Slayton noted that during the interview, Father was worried and afraid that he was going to be blamed for Aubree's injuries, but he was still willing to talk to Investigator Slayton. Investigator Slayton started the interview by reading Father his rights and getting background information about Aubree's care. Father explained that he and Mother shared parenting responsibilities—one parent would take care of Aubree while the other was working. However, Mother was on maternity leave for the first four weeks of Aubree's life; about three weeks before Aubree sustained the arm injury, they started using a babysitter. Father candidly stated that he was often tired when he cared for Aubree because he worked 12-hour shifts, was gone from the home for approximately 16-hours a day, and then was tasked with caring for Aubree when he came home. Father stated that he would sleep when he could. Investigator Slayton testified that, in his experience investigating child abuse cases, a very tired parent caring for a child sets a dangerous scenario. Regarding Aubree's broken arm, Father told Investigator Slayton that he picked Aubree up from her bassinet, heard something pop, laid her down on a changing table, and noticed she was not moving her arm, so he lifted her arm to investigate, and she pushed back, at which time, it felt like chalk breaking. He also demonstrated how he grabbed her by grabbing Investigator Slayton's arm and demonstrating using a pencil, and he used a wrenching motion. This caused Investigator Slayton concern and explained the likelihood that what happened to Aubree was physical abuse. Father also stated that Mother had told him that Aubree's shoulders had been popping.

Regarding the Child's rib fractures, Investigator Slayton informed Father that squeezing is what typically causes rib injuries in children. Father then stated that when Aubree was about one-month old, he was tired and agitated, and lifted Aubree out of her swing, turned her sideways, and squeezed her, and that this happened more than one time. Aubree did not cry when Father squeezed her but would cry "whenever he let pressure off." Father told Investigator Slayton that this happened when Mother was not home. Regarding Aubree's bucket-handle leg fracture, Investigator Slayton told Father that these types of injuries typically result from "a pushing-pulling motion." Father then stated that on one occasion, he was changing Aubree's diaper, she was "mad, angry, kicking," she kicked her leg out, and he pushed her leg back. Father stated that he never saw any bruises or marks on Aubree.

Investigator Slayton testified that, although Father denied causing Aubree's injuries, he "believed everything [Father] said," and considered Father's statements to be an admission of guilt.[8] Investigator Slayton testified that, by the end of the interview, Father was most concerned about how to tell Mother what happened in the interview. Investigator Slayton offered to help and took Father to the room where Mother was located. Investigator

---

[8] Father was criminally charged relating to Aubree's injuries. Father testified at trial but plead the 5th Amendment in response to every question asked. At the time of trial, Mother and Father were no longer together.

Slayton gave Mother a brief synopsis of what Father had stated during the interview. Father told Mother that Investigator Slayton made him realize what he had done to Aubree—that he was angry, did not get enough sleep, might have squeezed Aubree too hard, and that "he was the one who did this to her." According to Investigator Slayton, Mother was shocked at first, but her response was largely to console Father and to tell him that they would get him some help. At trial, Mother testified that after Investigator Slayton's interview with Father, she believed he caused all of Aubree's injuries. However, she also testified that she did not suspect anything because she did not think he was capable of hurting Aubree; she "never would have thought" that he would have hurt Aubree; she was "shocked that he would ever do something like that," and she did not want to believe it since he had always been a "good dad" and good partner to her. Mother felt angry, "had a lot of emotions," and was confused.

DCS Family Service Worker Jennifer Leftwich was assigned to Aubree's case within a week of her removal and remained assigned to the case through trial. FSW Leftwich supervised Mother's first visit with Aubree, after she was discharged from Vanderbilt. FSW Leftwich explained that Aubree was brought to the visit in a baby carrier with her arms and legs were wrapped, and that that "it was an intense sight to see . . . this baby so small wrapped in all these bandages." Although this was the first time Mother had seen Aubree since Aubree was admitted to Vanderbilt, FSW Leftwich stated that Mother had "no reaction at all, none, no, none," which was very odd to FSW Leftwich because "it took [her] breath" to see the baby. FSW Leftwich also had to intervene because Mother was holding Aubree in a manner that would have been painful to the Child in light of her broken bones. FSW Leftwich subsequently requested that Aubree receive therapeutic visitation, which is a service provided by DCS to allow for closely supervised and monitored visits, with parental assistance and intervention when necessary. According to FSW Leftwich's testimony, Mother attended each of the scheduled visits.[9]

DCS worked with Mother to develop a permanency plan, which was created on May 20, 2020 and ratified on June 3, 2020. Under the plan, Mother was required to complete a psychological evaluation and to follow all recommendations thereof. Scott Herman, MA, a licensed professional counselor and licensed senior psychological examiner, conducted four of the five psychological exams Mother attended. Mr. Herman testified that the psychological exams he conducted were "invalidated" due to Mother's unreliable responses, including "faking good" on the child abuse potential inventory (CAPI). The fifth and final psychological test, which was conducted by Catherine Grello, was not invalidated and indicated that Mother has "characteristics of know[n] physical child abusers." Dr. Grello recommended that Mother undergo "intense counseling with a Ph.D-

_____

[9] The Department was relieved from providing reasonable efforts due to the severe abuse finding entered by the juvenile court on November 26, 2019, and thus Mother was making her own visitation appointments. Although it was not required to do so, DCS continued to provide therapeutic visitation between Mother and Aubree up to the time of trial.

level or skilled-master-level therapist," and that she complete a psychiatric evaluation for depression and anxiety. In response to Dr. Grello's recommendation (and as approved by the trial court), in June 2020, Mother attended weekly treatment with Jerri Cross, a licensed professional counselor. Ms. Cross testified at a deposition in this matter, during which the parties stipulated that she was testifying as an expert in mental-health counseling and treatment. Ms. Cross' deposition was admitted into evidence at the hearing. Ms. Cross diagnosed Mother with "major depressive disorder recurrent moderate," "parent child relational problems," and "problems related to other legal circumstance." Although Mother testified that her depression was "situational," Ms. Cross testified that "her depression appears to not necessarily be situational; it was present in her first marriage, during the domestic violence, and then in her [relationship with Father]." Ms. Cross recommended the following treatments and goals: stress management, understanding and addressing depression, addressing and understanding domestic violence and toxic relationships, recognizing signs and symptoms of child abuse, understanding the seriousness of the allegations, safety planning for herself and Aubree, red flags in relationships, establishing healthy boundaries and healthy relationships, and positive coping skills. Ms. Cross also addressed Mother's romantic relationships. During each visit, Ms. Cross asked Mother whether she was in a relationship. Mother admitted to having at least three boyfriends during the pendency of the dependency-and-neglect proceedings. In the fall of 2020, Mother was involved with Michael B. FSW Leftwich testified that she was concerned about this relationship and advised Mother that Michael B. had a history with DCS of environmental neglect and substance abuse issues involving his own children. Furthermore, FSW Leftwich advised Mother that Michael B.'s brother was listed on the sex-offender registry. Mother testified that she discussed her relationship with Michael B. with Ms. Cross and was "proud" that she broke up with him after learning about his brother.

Ms. Cross ultimately opined that, although Mother was participating and progressing in her therapy, this fact did not mean that reunification should occur. In view of the severe abuse finding and because she could not make a clear determination that the Child would be safe with Mother, Ms. Cross explained that she could not recommend reunification. Furthermore, Ms. Cross testified that she was very concerned about the invalid psychological assessments performed by Mr. Herman because it is very "unusual" for psychological assessments to be consistently invalid. Ms. Cross explained that she was concerned that, if Mother was not being honest in her evaluations and counseling sessions, the "progress" Ms. Cross saw in Mother could possibly be fake.[10]

Regardless, despite the fact that FSW Leftwich discussed the need to undergo a psychiatric consult with Mother on at least five occasions, it is undisputed that Mother failed to complete a valid psychiatric assessment before the trial. FSW Leftwich testified that the psychiatric assessment was the most important action item because it was

---

[10] Approximately one month before trial, Mother filed a motion to change counselors because she felt that Ms. Cross was not truthful in her reports to the court.

imperative that Mother address her mental health issues before DCS could make a recommendation for reunification. Despite her failure to complete the necessary assessment, Mother testified that she did not believe that she had done anything wrong regarding Aubree. FSW Leftwich testified that Mother has never: (1) accepted responsibility for Aubree's injuries; (2) indicated that she could have done something more to protect her, or (3) indicated in any manner that she had any regret over what happened to Aubree. The only thing Mother said to FSW Leftwich regarding Aubree's injuries was that she did not physically harm Aubree. Likewise, Ms. Cross testified that "from the very onset of the case," Mother "indicated that she had no culpability in the case," and "seemed very unaware" that she had been found as a perpetrator of severe child abuse. Mother consistently told Ms. Cross that she had no involvement in what happened to Aubree, that Father was responsible for Aubree's injuries, and that Mother was at work when it happened. However, due to the timing of Aubree's injuries, i.e., her fractures were in various states of healing, CPSI Langford testified that it would be "very, very, very unlikely" that Mother was not present when Aubree sustained at least some of the injuries, especially since she was Aubree's primary caregiver during the time period when these injuries occurred. Furthermore, Father told FSW Leftwich that Mother was often overwhelmed by caring for Aubree, and often called Father at work so he could calm her down. Father also told FSW Leftwich that he was the only one who could soothe Aubree and that, if she could not be placed with him, he would rather her be adopted than placed with Mother.

Since she came into DCS custody at approximately 10-weeks old, Aubree has lived with her foster parents and their three children. FSW Leftwich testified that Aubree "does very well there," and it "is the only home she knows." Aubree is also bonded with her foster siblings. After being removed to DCS custody, Aubree underwent an evaluation by Tennessee Early Intervention Systems to determine whether she was meeting developmental milestones, and she was. Aubree was seen by a pediatrician, who also determined that she did not have any developmental delays. Since Aubree was removed to DCS custody, she has not sustained any broken bones.

Having entered a protective order on May 23, 2019, on October 9, 2019, the juvenile court conducted an adjudicatory and dispositional hearing and issued a Memorandum Opinion and Order finding that both Mother and Father had committed severe abuse against Aubree. On January 22 and February 7, 2020, the juvenile court conducted a dispositional hearing, and subsequently found that custody of Aubree should remain with DCS.

Both Mother and Father appealed to the Circuit Court of Overton County ("trial court") for a de novo hearing, which was conducted on May 24 and May 26, 2021. On September 21, 2021, the trial court entered an order, wherein it made the following findings of fact and credibility determinations:

The Court credits Dr. Nelson's testimony that [the parents] did not tell him of bruises on Aubree. The evidence at trial provided no solid explanation for the absence of the letter from Nurse Reeder in Dr. Nelson's records, but the Court credits Nurse Reeder's testimony that she did, in fact, send that letter to Dr. Nelson.

After professing great concern about the bruising on Aubree in Nurse Reeder's presence during the May 8, 2019 physical examination at the Overton County Health Department, [the parents] did not promptly follow up with Dr. Nelson. Instead, they waited eight full days to see Dr. Nelson. Even then, they did not speak to him about any concern about bruising. Neither did the parents discuss with Dr. Nelson any concern about possible lead poisoning or request further testing, as instructed by Nurse Reeder. Dr. Nelson's records contain no notation regarding any request for testing of lead and hemoglobin. It is reasonable to conclude that the lapse of eight days between the examination by Nurse Reeder and the May 16th office visit with Dr. Nelson provided time for the bruises to resolve. Tellingly, when asked about her communication with Dr. Nelson about the bruising, [Mother] responded that the bruises were "more than likely not visible at the time." This indicates awareness on [Mother's] part about the visibility of the bruises and further suggests that the delay in following up with Dr. Nelson was intentional.

[Mother] testified that she spoke to Dr. Nelson about her concerns about bruising on Aubree at the May 16, 2019 office visit. When asked what Dr. Nelson's response was when she brought the bruising to his attention, [Mother] replied that Dr. Nelson had no significant concerns. The Court finds [Mother's] testimony entirely implausible on this point, contrary to Dr. Nelson's firm testimony, and inconsistent with standard medical practice (as explained by both Dr. Williams and Dr. Nelson) when unexplained bruising is found on a non-mobile infant of Aubree's age.

\*\*\*

After [Father's] interview with Officer Slayton on May 23, 2019, there was an encounter at the offices of the Department of Children's services between [the parents]. Investigator Slayton testified that, after the interview, [Father] seemed most concerned about telling [Mother] about the interview. He walked into the adjacent room where [Mother] had been waiting and told her that Investigator Slayton "made him realize what he had done to Aubree." [Father] also said that he thought there was something wrong with him and that he had some sort of mental health problem. Slayton and Harli Langford both testified that [Mother] did not ask [Father] how he had caused harm or injuries to [Aubree]. Instead, [Mother] reacted lovingly and consoled [Father], saying, "We'll get you some help." [Mother] also stated that

[Father] could not get the help he needed if incarcerated. After hearing [Father] taking responsibility for Aubree's injuries, [Mother] went back home with [Father]; the two went out to dinner and bought an outfit for Aubree. Later on the evening of May 23rd, [Grandmother] called Harli Langford and asked her to persuade [Mother] that [Father] must leave the home. [Mother] admitted that, in the six days that the two remained together, between May 18 and May 23, 2019, she never asked [Father] what he had done to cause injury to their child. The Court finds this to be an incomprehensible response from the mother, and her lack of inquiry suggests that she already had some knowledge about how and by whom the injuries were inflicted.

In its Petition, the Department of Children's Services asked to remove Aubree from the custody of both her mother and her father because, as DCS Investigator Harli Langford testified, it could not be determined which parent inflicted the non-accidental trauma upon Aubree. Department of Children's Services Case Worker, Ms. Jennifer Leftwich, took over the case on or about May 30, 2019. She testified that a visit was arranged for [Mother] with Aubree on May 30th. This was the mother's very first visit with Aubree after removal. Aubree was in her infant carrier, with her arms and legs encased in soft casts. Ms. Leftwich testified that when [Mother] saw her child, there was no emotional reaction at all, no tears, no expressions of sympathy for Aubree's condition, no loving or hugging. Ms. Leftwich testified that she found [Mother's] lack of emotion and flat affect to be strange, "very distinct in her experience," and not what is usually expected during the reunion of a loving mother with an injured child. During the visit, Ms. Leftwich found it necessary to intervene and correct [Mother] because she was holding her injured infant in a position "sitting and leaning forward" that would have obviously caused pain to the child after having suffered multiple rib fractures.

Ms. Leftwich testified that, in her interactions with [Father] after Aubree's removal and placement in foster care, he expressed concern about Aubree returning to the custody of [Mother]. [Father] went so far as to tell Ms. Leftwich that he would rather that Aubree be adopted than return to her mother's care and custody. [Father] told Ms. Leftwich that he was typically the only one who could comfort or soothe Aubree when she was crying. He also told Ms. Leftwich that several times, when he was out of town working on a construction job, he would receive calls from [Mother] who was stressed and overwhelmed at home alone with Aubree. On such occasions, he told Ms. Leftwich, he would have to calm [Mother] down over the phone.

The Court finds the testimony of Ms. Jennifer Leftwich and Ms. Harli Langford very credible. Both Ms. Leftwich and Ms. Langford testified about their significant interactions with [the parents] after Aubree['s] injuries came to the attention of the Department of Children's Services. Neither parent ever

offered to Ms. Leftwich or Ms. Langford any history or explanation of the bruises on Aubree.

At trial, the Court also heard the testimony of [Grandmother]. . . . The Court finds [Grandmother's] testimony to be generally credible regarding her observations about her granddaughter, Aubree []. [Grandmother] testified that she saw Aubree almost every day and that Aubree cried a lot, like a baby suffering from colic. [Grandmother] was also aware that Aubree was screaming at night. Importantly, [Grandmother] testified that she noticed bruising on Aubree's torso, some on Aubree's back and some on her front, as if someone had "picked her up or held her wrong." [Grandmother] indicated that the bruises looked like they could have been caused by the ends of fingers. She could not make out any handprint. [Grandmother] testified that [Mother] brought the bruising on Aubree to her attention when Aubree was about two months old. [Grandmother] further testified that [Mother] told her she had seen previous bruising on Aubree's bottom. This is inconsistent with other portions of [Mother's] testimony about when she observed bruises on Aubree and the location of such bruises.

\*\*\*

The court finds that [Mother] is not a credible witness. There were many aspects of her testimony at trial that the Court found unbelievable and unpersuasive. First, and most importantly, [Mother's] testimony was generally evasive and equivocal. She contradicted her own testimony at this trial and at previous hearings. In every respect, and at every opportunity, [Mother] externalized any responsibility for what happened to her child. It was undisputed that Aubree [] spent the great majority of time in [Mother's] care, since [Father] worked twelve-hour shifts and often had an additional four hours of travel with his road construction job. [Mother's] tendency to blame others was notable in her blaming Dr. Nelson for not picking up on indications of possible abuse. [Mother] repeatedly voiced the view that she was completely exonerated because of the "admission" of responsibility that [Father] made to Investigator Slayton. [Mother] also asserted that Ms. Jerri Cross was not being truthful in her deposition testimony; she blamed Ms. Cross for not giving the picture [of] her condition and actions post-removal that [Mother] would wish. This Court recognizes [Mother's] propensity to foist blame on others and is unpersuaded by her professions to be without knowledge or responsibility regarding the injuries that her child suffered.

Based on the foregoing findings, and as discussed in further detail below, the trial held that Aubree was dependent and neglected in that both Mother and Father were unfit to care for her, neglected or refused to provide Aubree with medical care, injured and endangered Aubree's health, and committed abuse and neglect. The trial court also found

- 14 -

that both Mother and Father committed severe child abuse in that they "knowingly failed to protect the child from abuse and neglect that is likely to cause serious injury or death." Mother appeals.

## II. Issues

Mother raises the following issues for review as stated in her brief:

1. Whether or not the Court abused its discretion in finding that there was clear and convincing evidence that the minor child Aubree, is dependent and neglected as defined by T.C.A. 37-1-102 (12).
2. Whether or not the Court abused its discretion in finding that the minor child is a victim of severe child abuse as defined by T.C.A. 37-1-102, subsection (B) (27) under subsections (A), (B) and (C).
3. Whether or not the Court abused its discretion in finding that it is in the best interest of Aubree to remain in Foster Care.

## III. Standard of Review

This Court has explained that

[a] child who is suffering from abuse is a dependent and neglected child. *See* Tenn. Code Ann. § 37-1-102[(b)](1[3] )(G). A determination that a child is dependent and neglected must be supported by clear and convincing evidence. *See* Tenn. Code Ann. § 37-1-129(a)(1) & (c). Severe child abuse in a dependency and neglect proceeding must also be established by clear and convincing evidence. ***In re S.J.***, 387 S.W.3d 576, 591 (Tenn. Ct. App. 2012).

The "clear and convincing evidence standard" is more exacting than the "preponderance of the evidence" standard, although it does not demand the certainty required by the "beyond a reasonable doubt" standard. ***In re C.W.W.***, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000). The clear and convincing evidence standard defies precise definition. ***Majors v. Smith***, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). Evidence satisfying this high standard produces a firm belief or conviction regarding the truth of facts sought to be established. ***In re C.W.W.***, 37 S.W.3d at 474. Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. ***Hodges v. S.C. Toof & Co.***, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992).

Our review of the trial court's determinations on questions of fact is de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Whether a child has been proven dependent and neglected by clear and convincing evidence is a

question of law which we review de novo without a presumption of correctness. *In re H.L.F.*, 297 S.W.3d 223, 233 (Tenn. Ct. App. 2009).

*In Re Zaliyah S., et al.*, No. M2019-01241-COA-R3-JV, 2020 WL 3494471, *3 (Tenn. Ct. App. June 26, 2020) (citing *In re M.D.*, No. M2015-01023-COA-R3-JV, 2016 WL 5723954, at *3-4 (Tenn. Ct. App. Sept. 30, 2016) (quoting *In re Kaitlynne D.*, No. M2013-00546-COA-R3-JV, 2014 WL 2168515, at *1-2 (Tenn. Ct. App. May 21, 2014)).

Furthermore, to the extent that Mother's issues require interpretation of the dependency and neglect statutes, we are guided by the familiar rules of statutory construction. "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995) (citing *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993)). "The text of the statute is of primary importance." *Mills v. Fulmarque*, 360 S.W.3d 362, 368 (Tenn. 2012). A statute should be read naturally and reasonably, with the presumption that the legislature says what it means and means what it says. *See BellSouth Telecomm'ns., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997).

Finally, as set out in context above, the trial court made specific findings concerning the credibility of certain witnesses. With regard to credibility determinations, this Court has stated:

> When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. Further, "[o]n an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings."

*In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)). In the context of dependency and neglect actions, "[t]o the extent the trial court's determinations rest upon an assessment of the credibility of witnesses, the determinations will not be overturned absent clear and convincing evidence to the contrary." *In re Zaliyah S.*, 2020 WL 3494471, at *3 (citing *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)).

# IV. Analysis

## A. Dependent and Neglected Child Finding

As is relevant to this appeal, Tennessee Code Annotated section 37-1-102(b)(13) defines a "dependent and neglected child" as one: (1) "[w]hose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child," Tenn. Code Ann. § 37-1-102(b)(13)(B); (2) "[w]hose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child," Tenn. Code Ann. § 37-1-102(b)(13)(D); (3) "[w]ho is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others," Tenn. Code Ann. § 37-1-102(b)(13)(F);and (4) "[w]ho is suffering from abuse or neglect." Tenn. Code Ann. § 37-1-102(b)(13)(G). Tennessee Code Annotated section 37-1-129(b)(2) states, in relevant part, that, "[i]f the petition allege[s] the child was dependent and neglected as defined in § 37-1-102(b)(13)(G) . . . the court shall determine whether the parents or either of them . . . committed severe child abuse." If a child is the victim of severe child abuse, she is dependent and neglected. Tenn. Code Ann. § 37-1-102(b)(13)(G).

In its September 21, 2021 order, the trial court found Aubree to be a dependent and neglected child under the four definitions enumerated above. We will address the trial court's finding of dependency and neglect by severe child abuse in detail below. However, we first address the trial court's findings of dependency and neglect under the definitions set out at Tennessee Code Annotated sections 37-1-102(b)(13)(B), (D), and (F).

First, the trial court found that Aubree "is a dependent and neglected child, with respect to both of the respondent parents, within the meaning of T.C.A. § 37-1-102(b)(13)(B), in that she is a child '[w]hose parent . . . by reason of cruelty, mental incapacity, immorality, or depravity is unfit to properly care for such a child.'" Specifically, the trial court held:

> The testimony of Dr. Heather Williams demonstrated conclusively that [the Child] had been subjected to non-accidental trauma that caused approximately seventeen fractures at varying times within the first two months of her life. Significant force was applied to Aubree's small body in order to inflict these multiple injuries. Upon discovery of the many fractures in many different stages of healing, neither parent offered Dr. Williams any persuasive explanation for how these injuries occurred. It was uncontroverted that [the parents] were the persons who had caregiving responsibility for Aubree and who were most familiar with her habits and needs. Any responsible, prudent caregiver dealing with a non-mobile infant with a history of bruising, who was difficult to hold and soothe, and who was

- 17 -

"screaming at night" would have recognized that something was severely wrong. Neither parent provided any plausible explanation of prior bruising upon Aubree, although testimony from numerous witnesses established that they were aware of prior bruising. Based on the evidence . . . the Court finds that both [parents] engaged in conduct which placed Aubree at significant and severe risk of harm and are unfit to properly care for their child. Accordingly, [the Child] is a dependent and neglected child within the meaning of T.C.A. § 37-1-102(b)(13)(B). The Court makes this finding by clear and convincing evidence.

Next, the trial court found, by clear and convincing evidence, that Aubree "is a dependent and neglected child within T.C.A. § 37-1-102(b)(13)(D) in that she is a child '[w]hose parent . . . has neglected or refused to provide necessary medical, surgical, institutional, or hospital care for such child.'" Specifically, the trial court held that

the facts of this case demonstrate that the respondent parents knew, or should have known, of the injuries to Aubree which were inflicted over a substantial period of time. However, they failed to make serious medical inquiry about, or timely follow up on, securing some diagnosis to explain the bruising upon this non-mobile infant. The uncontroverted evidence reflects that there was a medical appointment at which Nurse Megan Reeder observed bruising on Aubree's cheek and abdomen. At that time, Nurse Reeder discussed with the parents a possible alternative cause for such bruising. Nurse Reeder discussed with both parents the possibility of lead poisoning and encouraged the parents to promptly consult their primary care [provider] for diagnostic testing. Tellingly, the parents did not heed that advice, and did not take Aubree to see Dr. Nelson until some eight days later. This is especially curious because [Grandmother] was then employed at Dr. Nelson's office and could presumably have facilitated a prompt appointment. The Court credits Dr. Nelson's testimony that the parents did not discuss with him any bruising upon their non-mobile infant in their appointment on May 16, 2019. Had there been any prompt and responsible report of prior bruising, any prompt and responsible follow up on the bruising noted at the May 8th appointment at the Overton County Health Department, by either parent, Aubree could have at least been spared the fracture to her arm.

The trial court also found, by clear and convincing evidence, that Aubree "is a dependent and neglected child under subsection 37-1-102(b)(13)(F) in that she is in such a condition of want or suffering, and is under such improper guardianship or control as to injure and endanger [her] health . . . ."

In her appellate brief, Mother's sole argument concerning the trial court's findings of dependency and neglect based on the statutory definitions set out at Tennessee Code

- 18 -

Annotated sections 36-1-113(b)(13)(B), (D), and (F) is as follows:

> As to this issue [i.e., issue one concerning the trial court's finding of dependency and neglect], the Mother would aver that [] she was not aware that the child was being abused by the father and had no idea of said abuse. The Mother was only 23 years old and this was her first child. There is no proof in the record that Mother willingly abused Aubree or willingly and knowingly allowed Aubree to be abused or neglected by another.

Mother's briefing is insufficient. Tennessee Rule of Appellate Procedure 27(a)(7) requires an appellant's brief to contain, *inter alia*,

> [a]n argument, which may be preceded by a summary of argument, setting forth: (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and (B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues) . . . .

Tenn. R. App. P. 27(a)(7). Tennessee Court of Appeals Rule 6(b) states that

> No complaint of or reliance upon action by the trial court will be considered on appeal unless the argument contains a specific reference to the page or pages of the record where such action is recorded. No assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded.

Tenn. R. Ct. App. 6(b).

Concerning deficiencies in an appellate brief, this Court has previously explained:

> Our Courts have "routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as described by Rule 27(a)(7) constitutes a waiver of the issue[s] [raised]." **Bean v. Bean**, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000). In **Bean**, we went on to hold that "an issue is waived where it is simply raised without any argument regarding its merits." **Id**. at 56; *see also* **Newcomb v. Kohler Co.**, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) (holding that the failure of a party to cite to any authority or to construct an argument regarding his or her position on appeal constitutes waiver of that issue). As we stated in

*Newcomb*, a "skeletal argument that is really nothing more than an assertion will not properly preserve a claim." *Newcomb*, 222 S.W.3d at 400. It is not the function of this Court to verify unsupported allegations in a party's brief or to research and construct the party's argument. *Bean*, 40 S.W.3d at 56.

Despite the fact that [the appellant's] brief is woefully inadequate, there are times when this Court, in the discretion afforded it under Tenn. R. App. P. 2,[11] may waive the briefing requirements to adjudicate the issues on their merits.

*Chiozza v. Chiozza*, 315 S.W.3d 482, 487-89 (Tenn. Ct. App. 2009). Although the argument section addressing Mother's first appellate issue wholly fails to comply with the requirements of Tennessee Rule of Appellate Procedure 27(a)(7) and Tennessee Court of Appeals Rule 6(b), given the nature of this case, we conclude that it is appropriate to exercise our discretion to waive the briefing requirements in order to adjudicate the issue on its merits. *See* Tenn. R. App. P. 2.

As discussed in detail above, there is no dispute in the record that Aubree suffered between 15 and 17 bone fractures by the time she was ten-weeks old. Furthermore, every expert who testified opined that, from the medical evaluations, these injuries were the result of non-accidental trauma that was perpetrated from the time of Aubree's birth until she was removed to DCS' custody. It is also undisputed that Mother and Father were Aubree's primary caregivers and were periodically alone with her during the time period in which she sustained the injuries. Given the extent of Aubree's injuries, the fact that neither parent could (or would) give any plausible explanation for how these injuries occurred, and the medical testimony regarding what can only be described as a continual pattern of abuse against the Child, there is ample evidence to support the trial court's determination that Aubree is a dependent and neglected child insofar as her Mother, "by reason of cruelty, mental incapacity, immortality, or depravity is unfit to properly care for [her]," and insofar as the Child was found to be "in such a condition of want or suffering, and [] such improper guardianship . . . as to injure and endanger [her] health." Tenn. Code Ann. §§ 37-1-102(b)(13)(B), (F).

There is also clear and convincing evidence to support the trial court's finding that Aubree is dependent and neglected due to the fact that Mother "neglected or refused to provide necessary medical . . . or hospital care." Tenn. Code Ann. § 37-1-102(b)(13)(D). As discussed in detail above, and based on the trial court's factual and credibility findings, it is clear that Mother failed to obtain prompt medical attention for Aubree. Mother ignored

---

[11] Tennessee Rule of Appellate Procedure 2 provides, in relevant part, that

For good cause, including the interest of expediting decision upon any matter, the Supreme Court, Court of Appeals, or Court of Criminal Appeals may suspend the requirements or provisions of any of these rules in a particular case on motion of a party or on its motion and may order proceedings in accordance with its discretion . . . .

- 20 -

Nurse Reeders' recommendation for lead testing, and the record supports the trial court's finding that Mother failed to mention Nurse Reeders' recommendation to Dr. Nelson. In fact, Mother never mentioned the bruising concern to Dr. Nelson. In addition to withholding this information from Dr. Nelson, Mother also delayed the Child's visit with Dr. Nelson for more than a week after seeing Nurse Reeder.

Even after it was apparent that Aubree sustained a broken arm, Mother failed to present the Child at Vanderbilt at the time of her scheduled appointment. Mother's part in delaying Aubree's medical treatment, her failure to disclose all of the Child's symptoms to providers, and her general nonchalant attitude concerning the extent and severity of Aubree's injuries and the cause of those injuries, provides clear and convincing proof that Aubree was dependent and neglected by Mother under the definition set out at Tennessee Code Annotated section 37-1-102(b)(13)(D).

## B. Severe Child Abuse

In its September 21, 2021 order, the trial court further held that, "under subsection 37-1-102(b)(13)(G), [] Aubree . . . has suffered from abuse and neglect under the statutory meaning of those terms. . . ." Having determined that Aubree suffered from abuse and neglect, the trial court went on to find that Aubree was the victim of severe child abuse. Tenn. Code Ann. § 37-1-129(b)(2) ("If the petition allege[s] the child was dependent and neglected as defined in § 37-1-102(b)(13)(G) . . . the court shall determine whether the parents or either of them . . . committed severe child abuse." Here, the trial court found that Mother committed severe child abuse under the definition set out at Tennessee Code Annotated section 37-1-102(b)(27). In relevant part, the statute provides:

> (27) "Severe child abuse" means:
>
> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(c);

Tenn. Code Ann. § 37-1-102(b)(27)(A)(i)-(ii). Tennessee Code Annotated section 39-15-402(c) defines "serious bodily injury," in relevant part, as follows:

> (c) "Serious bodily injury to the child" includes, but is not limited to. . . a fracture of any bone . . . injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement. . . .

Under the foregoing definitions, Mother may be found to have committed severe child

abuse on one of two alternate theories. First, DCS may prove, by clear and convincing proof, that Mother "knowing[ly] use[d] [] force on [the] [C]hild that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-102(b)(27)(A)(i). Alternatively, DCS may show, by clear and convincing proof, that Mother "knowing[ly] expos[ed] [the] child to or [] knowing[ly] fail[ed] to protect [the] [C]hild from abuse or neglect that is likely to cause serious bodily injury or death." *Id.* Here, Mother maintains that she did not perpetrate the abuse on Aubree; rather, she adamantly maintains that Father, alone, caused the Child's injuries. As such, the issue here is whether Mother knowingly exposed Aubree to or failed to protect her from such severe abuse. The trial court held that

> whether one of these parents, or both of these parents, actually exerted the force necessary to inflict the injury, the Court finds that, at a minimum, both parents knowingly failed to protect their child from abuse or neglect that was likely to cause serious bodily harm. Therefore, Aubree [] has been subjected to "severe child abuse" by both [Mother] and [Father].

Regarding the "knowing" requirement in the severe child abuse statute, Tenn. Code Ann. § 37-1-102(b)(27)(A)(i), this Court has explained that

> [t]he term "knowing" . . . is not defined by statute. . . .   In the context of the dependency and neglect statutes, the term has been described as follows:
>
>> We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

*In re Caleb J.B.W.*, No. E2009-01996-COA-R3-PT, 2010 WL 2787848, at *5 (Tenn. Ct. App. July 14, 2010) (citing *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122, at *7 (Tenn. Ct. App. July 13, 2004)). In other words, the "knowing" requirement is not limited to parents who are present when severe abuse actually occurs. A parent's failure to protect a child will also be considered "knowing" if the parent had been presented with sufficient facts from which he or she could have and should have recognized that severe child abuse had occurred or that it was highly probable that severe child abuse would occur. *See In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009) (citation omitted). Furthermore,

> the "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver.  Moreover, "knowing" conduct by a parent or caregiver is not

limited to conduct *intended* to cause injury.

*Id.* (emphasis in original).

In reaching its conclusion that Mother committed severe child abuse by knowingly failing to protect Aubree, the trial court relied on two cases from this Court, *In re N.T.B*., 205 S.W.3d 499 (Tenn. Ct. App. 2006), and *In re E.Z.*, No. E2018-00930-COA-R3-JV, 2019 WL 1380110 (Tenn. Ct. App. Mar. 26, 2019). In *In re N.T.B.*, we affirmed the trial court's finding that the child was severely abused and dependent and neglected where "in all likelihood, one parent abused the child and the other parent is protecting that parent." 205 S.W.3d at 508. Although, in *In re N.T.B.*, as in the instant case, the parents maintained that they had no knowledge of what happened to the child, medical proof showed that the four-month-old child suffered a skull fracture, brain injury, and multiple broken bones. *Id.* at 507. The child's injuries, like Aubree's, were multiple, very serious, inflicted on separate occasions with great force, and were not self-inflicted or accidentally-inflicted. *Id.* Based on these facts, the trial court rejected the parents' contention that they had no knowledge of the mechanism of the injuries and found that "there were sufficient facts from which, at a minimum, each could have, and should have, recognized that severe child abuse had occurred . . . ." *Id*. Specifically, the trial court held "that the severe child abuse was known in that the injuries sustained by this child were either caused by one or both [parents] or occurred by their reckless, knowing disregard, and that in all likelihood, one parent abused the child and the other parent is protecting that parent." *Id.* at 508. The same is true here. Even if Mother did not cause the injuries to Aubree, there can be no doubt that she disregarded signs of injury and was reckless in postponing immediate treatment and withholding pertinent information from Aubree's medical providers.

The case of *In re E.Z.* involved serious injuries to a three-month-old child, which injuries were perpetrated over time. We held that the child was the victim of severe child abuse where both parents denied knowledge of the mechanism of the child's injuries. In that case, we noted that

> Mother's and Father's denials, by themselves, are not dispositive of anything. B.G.'s injuries fit within the definition of serious bodily harm necessary to sustain a finding of severe child abuse. The Trial Court found that "one or both parents are responsible for the injuries sustained by [B.G.]" and that "both parents know which of them harmed this child."

*In re E.Z.*, 2019 WL 1380110, at \*18. We explained that it was not necessary to "identify which parent physically applied the violent force necessary to inflict the injuries." *Id.* Rather, we held that a finding of severe child abuse could be drawn from the trial court's credibility determinations, medical records, and other evidence because, "at a minimum," each parent "could have and should have recognized that severe child abuse had occurred . . . ." *Id.* (citing *In re N.T.B.*, 205 S.W.3d at 506-507). Indeed, this Court has explained

- 23 -

that

> [e]ach specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.

*In re S.J., et al.*, 387 S.W.3d 576, 592 (Tenn. Ct. App. Aug. 9, 2012), *perm. app. denied* (Tenn. Oct. 17, 2012).

To dispute the trial court's finding of severe child abuse, Mother relies on the case of ***Tennessee Department of Children's Services v. H.A.C.***, No. M2008-01741-COA-R3-JV, 2009 WL 837709, at *2-4 (Tenn. Ct. App. Mar. 26, 2009), wherein we reversed the trial court's determination that a mother's failure to seek medical attention constituted severe child abuse under Tennessee Code Annotated section 37-1-102(b)(27)(A)(i). In ***In re H.A.C.***, the child suffered non-accidental trauma, resulting in a broken femur and two broken ribs. *Id.* at *1. The rib fractures were at least nine days old by the time the mother took the child to the hospital. *Id.* The father admitted to "picking up the child and squeezing him around the chest and back while frustrated." *Id.* While this court found the mother's failure to immediately seek medical attention was "evidence suggesting that Mother may have failed to protect the child from Father's abuse," we recognized that "reasonable minds may differ concerning whether Mother should have taken affirmative action" at the time. *Id.* at *4. We reasoned that the record did not establish that the child's ribs were fractured on that occasion or that the child's cries established the mother knew about the injury. *Id.* Thus, we held that the evidence did "not clearly and convincingly establish that Mother knowingly failed to protect the child by not immediately seeking medical care for the child or by not reporting this event to medical providers or the authorities." *Id.* The ***In re H.A.C.*** case is distinguishable from the instant appeal.

Here, Mother—a certified nursing assistant—was Aubree's primary caregiver for the first month of her life. Mother testified that she knew Aubree was fussy and "screaming at night" to the point that Mother was "overwhelmed." Also, at the latest, Mother was aware of bruising on Aubree when she was one-month old; however, based on Dr. Nelson's testimony and the trial court's credibility findings, Mother failed to disclose this information to Aubree's pediatrician. Furthermore, Mother failed to follow Nurse Reeder's recommendation to request further testing from Dr. Nelson. In fact, Mother did not take Aubree to see Dr. Nelson for more than a week following Nurse Reeder's recommendation. Even after Aubree was diagnosed with a broken arm, Mother waited four days to take her for evaluation at Vanderbilt. In ***In re H.A.C.*** there was no indication that the child's ribs

were fractured so as to trigger Mother to seek immediate medical attention or to report any issues to the child's medical providers. **Id.** Here, however, Mother did seek medical attention for Aubree based on bruising and incessant crying. She was instructed by medical professionals to seek further testing and treatment, but she delayed this treatment and also failed to fully apprise Aubree's treating physicians of the concerns and recommendations of other doctors, who had seen Aubree. As such, this case is more in line with the holdings in **In re N.T.B.** and **In re E.Z.**, discussed *supra*. The combined weight of all of the facts presented in this case clearly and convincingly support the trial court's holding that Mother, at the very least, "knowing[ly] fail[ed] to protect [Aubree] from abuse or neglect that [was] likely to cause serious bodily injury." Tenn. Code Ann. § 37-1-102(b)(27)(A)(i).

## C. Best Interest

When a court determines that a child is dependent and neglected, it proceeds to render a "disposition best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code. Ann. § 37-1-130(a). "The court may permit the child to stay with her parents, guardian, other custodian, or transfer temporary legal custody to an individual 'qualified to receive and care for the child' or to DCS." **In re E.Z.**, 2019 WL 1380110, *19 (citing Tenn. Code Ann. §§ 37-1-130(a)(1), (2)). However, "[n]o child who has been found to be a victim of severe child abuse shall be returned to the custody or residence of any person who engaged in or knowingly failed to protect the child from the brutality or abuse unless the court finds on the basis of clear and convincing evidence that the child will be provided a safe home free from further such brutality and abuse." Tenn. Code. Ann. § 37-1-130(c).

> Here, the trial court held that, in view of its
>
> finding that both parents perpetrated severe child abuse by knowingly failing to protect Aubree from abuse or neglect likely to cause serious bodily harm, the Court cannot return Aubree [] to the care of her parents unless there is clear and convincing evidence that she would be safe in the care of the parents. No clear and convincing evidence exists in this case to convince this Court that Aubree would be safe from further abuse in her parents' care.

Mother challenges this finding. She argues that because she has missed only one visit with Aubree since the proceedings began, pays child support, has a home of her own, is employed, has learned the warning signs of abuse, has the support of Grandmother, and loves Aubree very much, it is in Aubree's best interest to be placed in Mother's custody. In view of the evidence, Mother's arguments are not persuasive.

Specifically concerning why it would not be safe for the Child to be returned to Mother's custody, the trial court noted that Mother "has completed many of the steps set forth for her on the permanency plan." Indeed, as Mother argues, the record shows that

she has stable housing and employment, and she is attending school. However, the trial court was concerned about Mother's sessions with Ms. Cross, who testified that, although Mother has been successful in completing some tasks, Mother has "not express[ed] to Ms. Cross any understanding that she had been found to be a perpetrator of severe child abuse by non-protection." The record indicates that, throughout these proceedings, Mother has maintained that she "has not been found guilty of anything," and that Aubree's injuries "had all been done [by Father]." The trial court also noted that

> Ms. Cross further testified that an important part of working with parents who have been non-protective is to help them understand the problem and to be better protective going forward. Jerri Cross testified that [Mother] has difficulty with consistency and processing information, which [Mother] attributes to a learning disability. Ms. Cross testified in her deposition that [Mother] has not provided accurate and complete information to her about subsequent relationships with men, which of course, would be important information to assessing her level of protectiveness and assessing [Mother's] home situation for disposition purposes. Ms. Cross noted that one significant relationship that [Mother] had was with a person who had a sex abuser in his immediate family. [Mother] did not initially know how to check the sex abuser registry, but Ms. Cross instructed her how to do that.

As set out above, the trial court made a specific finding that Mother was not a credible witness. Again, "[t]o the extent the trial court's determinations rest upon an assessment of the credibility of witnesses, the determinations will not be overturned absent clear and convincing evidence to the contrary." *In re Zaliyah S.*, 2020 WL 3494471, at \*3 (citation omitted). Having reviewed Mother's testimony, we agree with the trial court's assessment that

> there were many aspects of her testimony at trial that the Court found unbelievable and unpersuasive. First, and most importantly, [Mother's] testimony was generally evasive and equivocal. She contradicted her own testimony at this trial and at previous hearings. In every respect, and at every opportunity, [Mother] externalized any responsibility for what happened to her child.

Throughout these proceedings, Mother has never taken responsibility for Aubree's injuries. Even assuming that Mother did not perpetuate the injuries, as she has adamantly maintained, she has not demonstrated any true understanding of just how egregious Aubree's injuries were. In fact, between the time Mother and Father took Aubree to Livingston Hospital on May 18 and May 23, 2019, when Aubree was removed from their custody, Mother never asked Father what happened to Aubree's arm and continued to live with him and share parenting responsibilities with him. Mother testified:

Q. Did you [Mother] ask [Father] what happened . . . to have [Aubree's] bone be broken. . . .
A. I didn't . . . ask him what happened.
Q. Okay. Don't you think, once again, if you're going to be with somebody and stay with them in a relationship for six days after finding out that your child's arm just broke that you would want to know what happened to cause the break?
A. Yes, I want to know.
Q. It's true you never got an answer?
A. I never did.
Q. Why did you feel comfortable and satisfied with never receiving an answer over those six days?
A. We'll at that time, I didn't know that he had done that. I didn't know it was him that had done it.
Q. What did you think happened to cause her arm to break? She is a ten-week-old baby. [] [W]hat investigation did you do as a mother to a ten-week-old baby to say, what happened to my child?
A. I didn't ask him what happened.

The foregoing testimony demonstrates the gravamen of the concern with Aubree being in Mother's care. While Mother may be able to provide Aubree's necessities, a parent must also be vigilant in protecting and prioritizing his or her child. The majority of parents do this innately; however, this instinct appears to be lacking in Mother. As FSW Leftwich testified, when Mother first saw Aubree with the bandages on her limbs, Mother showed no emotion and, in fact, held Aubree in a way that would cause Aubree pain. There is a photo of the Child in the record showing all of her limbs wrapped in bandages. It is a heart-wrenching photo, and it is inconceivable to this Court that any person, much less a parent, would not have a visceral reaction to seeing a child in this state. Yet, as FSW Leftwich explained, Mother had "no reaction at all, none, no, none."

From the record, Mother is also untruthful and evasive. This may account for why she has not taken any responsibility for Aubree's injuries and has failed to demonstrate even the most basic parental concern. As the trial court correctly noted, "[t]he continuing and seemingly pervasive problem of [Mother's] inconsistency and lack of candor makes it impossible for this Court to determine that it would be safe for Aubree [] to be returned to [Mother's] custody." We agree. Mother's lack of candor also resulted in her undisputed failure to complete the required psychological assessment. As the trial court found:

> [Mother] was given a psychological assessment on four separate occasions, and none of the tests were reliable or valid due to her "manipulation" and "faking good" responses. [Mother] sought out another provider to administer a fifth assessment, but it was not the type of psychological assessment needed to comply with her permanency plan.

The Court is troubled that [Mother] failed four psychological assessments. Subsequent assessments with Ph.D-level provider, Ms. Cathy Grello, were persuasive, but they were unhelpful in demonstrating that it would be safe to return Aubree to [Mother's] care. Neither the deception scale test, nor the child abuse index performed as part of Ms. Grello's assessment was favorable to [Mother]. Further, [Mother] has failed to comply with Ms. Grello's recommendation that she submit to a psychiatric evaluation.

Mother's testimony supports the trial court's findings:

Q. Okay. What would you consider the most important treatment goal for you in the sense of reunifying with your child?
A. Keeping my depression under control, my stress level down, becoming a better, a better mother for Aubree. Which I have, I've been able to learn things and grow from this through counseling.
Q. Can you tell me then why is it that you have not passed a child abuse inventory exam over the last two months—excuse me, two years?
A. I thought I did have one that I passed.
Q. Which one did you think you passed?
A. I went to Knoxville and took one down there, a psychological—
Q. Dr. Grello?
A. I think that's her name.
Q. Okay. Well, you didn't. You didn't pass it.
A. Okay.
Q. And you haven't passed a child abuse inventory test despite five psychological [exams] to this day, would you agree with that?
A. If that's what they have, yes.
Q. Would you agree that that is a serious concern that a test would indicate that you have the profile of high risk physical abuse for a child to be in your care?
A. No.
Q. Why is that not a concern?
A. Because a test can't read me like normal people can.
Q. Well, wouldn't it be reasonable then for the, someone who's evaluating the situation to need to see something like that to see if you can pass a test that evaluates your child abuse potential?
A. If that's what they want then, yes, but a test does not define what type of mother I am to my child.

Mother's perpetual denial of any wrongdoing, her lack of candor with psychologists, and her belief that the evaluations are not worth her time evince a cavalier attitude concerning the systemic abuse that was perpetrated on her child. The facts presented here

are similar to those presented in **In re Nehemia H.**, Nos. 2017-CV-79, 2017-CV-80, 2020 WL 3885956 (Tenn. Ct. App. July 8, 2020). In **Nehemia H.**, we noted that, "[a]lthough the parents had improved their living conditions somewhat, neither parent apparently recognized the role he or she had played in the Children's trauma. Instead, as the trial court found, the parents attempted to deflect blame and mislead their counselors concerning the magnitude of the abuse." **Id.** at *9. In affirming the trial court's finding of dependency and neglect, severe child abuse, and its finding that it was in the children's best interest to remain in DCS custody, we further noted that

> [a]lthough the court commended Mother concerning improvements to her lifestyle and mental state, the court found her lack of disclosure with therapists and the evaluator regarding her participation in the abuse to be troubling. The court also noted that Mother continued to blame Father for her estrangement from the Children and had not acknowledged her own responsibility for the current situation. Following our thorough review of the evidence, we determine that the proof supports the trial court's findings and conclusions in this regard.

**Id.** at *10. The same is true here. From the totality of the circumstances, we conclude that there is clear and convincing evidence that the Child will not "be provided a safe home free from further [] brutality and abuse" if returned to Mother's care. Tenn. Code. Ann. § 37-1-130(c). Because the threat to the Child's safety still exists, we affirm the trial court's decision to leave Aubree in DCS' custody.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Taylor R. Because Taylor R. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE